Good morning. May it please the court. I represent the defendant Lance Mondin. In this consolidated case, all three defendants filed motions to suppress challenging the traffic stop. I will argue for nine minutes on the challenge to the denial of the motion to suppress, reserving two minutes of my time for rebuttal. The seizure and eventual search of the card issue violated the fourth amendment. First, law enforcement lacked reasonable articulable suspicion of criminal activity to justify the traffic stop. Second, even if this initial seizure was lawful, law enforcement unlawfully extended the scope of the stop by continuing to detain and question Ms. Pill after reasonable suspicion no longer existed. Finally, Ms. Pill did not consent to a search of the trunk and therefore the search was unlawful. Turning first to the seizure, a general description of a gray Ford Taurus seen near the scene of a robbery and leaving is insufficient to provide a reasonable articulable suspicion of a traffic stop. Why? It's very vague in general, your honor, and it's different from many of the cases that have been before this court with somewhat similar facts. But if you got a you got make and model in color, that's a pretty good description of an automobile. It is a good description, but the question is, does the information and does the tip provide a reasonable suspicion of criminal activity? And that's the distinction between the facts here and the cases cited by the district court and the government. But it was linked to the bank robbery, right? Very vaguely. And it wasn't. And the other cases, a lot of times the tipster either saw a crime itself, saw the suspects commit criminal activity, get in whatever car was the car, flee the scene of a crime. How far from the bank was the stop? It was roughly eight minutes away as far as miles. I am not sure at the top of my head, but it was roughly eight minutes after the robbery occurred that the that the traffic stop occurred. But that was those calculations were done after the fact, your honor. And we judge reasonable suspicion as it existed and the facts that were known by the officer at the time that seizure occurred. And here, all that deputy earned knew was that there was this gray Ford Taurus and the general vague idea that it was near the scene that a robbery occurred and was seen leaving. There was no evidence that the gray Ford Taurus and it was not told to law enforcement that it was fleeing, that there was something suspicious about it. And in fact, law enforcement was told that there was two suspects. And when deputy or sees the gray Ford Taurus, he notes that, that there is only one woman in the car. And while there is a visible, I'm sorry, that's visible. Yes, that's correct. Your honor. And so based off of just the vague information in the tip itself, that doesn't lead to reasonable suspicion of criminal activity. It doesn't rise to the level of necessary to justify the seizure of the vehicle. There's also the concern of how this information is being transmitted to law enforcement. It essentially was a game of telephone and that you have the tipsters, the four individuals in the truck who call into the bank and then the employee of the bank then calls into dispatch. And she's obviously quite frazzled and she's transmitting it. She didn't see what she saw, of course, what happened in the bank, but she didn't see what occurred outside of the bank. So that goes to reliability, which again, is part of the totality of the circumstances when determining whether reasonable suspicion existed. So combining just the lack of strong information that this gray Ford Taurus was involved in a crime with the concerns about how the information was transmitted, reasonable suspicion is not established. And even if this court does determine that reasonable suspicion did exist, deputy or unlawfully extended the scope of the stop by continuing to detain and question miss pill after reasonable suspicion no longer existed. Now it's easy to say because of what was discovered, but of course it seems reasonable that deputy or did what he did, but looking at the facts that were known at the time, reasonable suspicion did not exist. At the time of the seizure. And as he's walking up, he learns that the tipsters no longer believe that great Ford Taurus is involved. And he can see why they think that for himself, because the information was that two suspects were seen playing. And this is one woman. And when he goes and talks with her, there's nothing about that interaction that raises his suspicions. It's not what we generally see in these investigative stops where the driver, the occupant seemed nervous. There was nothing according to deputy or that rose any red, uh, raised any red flags for him. He didn't see any evidence of the robbery in the vehicle itself. And so when in these investigated investigative stops, generally what is proper is that a law enforcement can ask the suspect for his or her name, general questions like deputy or did, where are you going? Where are you coming from? But at that point, when the already weak information provided by police, um, seems to not be corroborated by what he sees at the scene and nothing that she responds with gives him any concern or fear as he stated that he thought this great Ford Taurus was involved in the robbery. It should have stopped. The scope of the stop was done because reasonable suspicion no longer existed at that point. The witness say that, that he believed that, that he changed his mind, that the Taurus was no longer involved, or was he just concerned here? She just concerned that he thought two people were running toward the car, but only saw one in it. I think it's kind of both. They, they had indicated they thought it was no longer involved. They did state that. And it was because they thought there was two people that were running towards the vehicle and they saw two people flee the bank, but in the car, they only saw one woman. But wouldn't it be reasonable for the officer to think that perhaps somebody was concealed in the car and that's what caused him to come back and say, can we look in the trunk? No, Your Honor. It's reasonable to, to seize the car, to ask questions, to ask those investigative questions as this court's case law has indicated. And if nothing about that interaction indicates, it can't then go on a fishing expedition and ask for consent to search. But his mission in making the stop is to determine whether that particular car was involved in, in a bank robbery, right? That's correct. And you know, the witness said there were two people running toward it and all of a sudden there was just one in the car. Wouldn't it be reasonable to then say, well, let's, to, to dispel our suspicion about that car's involvement. Let's see if somebody is hiding in the trunk. If there was reasonable suspicion that that car was involved at all. And it, this kind of ties back in with the issues with just the really not a lot of great information in the initial tip. But the, the problem is, is that reasonable suspicion no longer existed at that point. So the investigation should have stopped and it's not proper to then continue to detain the vehicle and ask for consent to search. Ms. Crick, you're in your rebuttal. You can continue if you like, or you can reserve it. I will reserve the remainder of time. Thank you. Mr. Goldensoff. May it please the court. Your Honor, my client's name is Mr. Stanley Mosley. He was ultimately found to be a career offender and for, among other reasons, because he had the adequate number of predicate offenses. And that's what I'm going to speak about in my six minutes. I'm going to start off by talking about... Before you get too deep into that, didn't the district court say that whether or not he was a career offender, she'd give the same sentence? Yes, Your Honor, he did. And so therefore, wouldn't it be harmless? Well, Your Honor, Your Honor, I would point the court to a case that came down from the Mr. Molina-Martinez sentencing guideline was determined to be one thing, but it was later discovered that there was an error that was made during the calculation. And the Fifth Circuit determined, well, because Mr. Molina-Martinez sentence was in the original or was in the... His original sentence would have been within the guidelines that were ultimately determined to be it's not because this is the... When a court is sentencing, you need to have the correct guidelines in order to... Well, my recollection of that case is that it's a plain error case. And the court just said, you should assume that it meets the plain error standard. Sure, but I think it's instructive that the Supreme Court felt that where it landed... I think that vitiates all of our cases where we've held that if a judge says I'd have given the same sentence, and if I get the guidelines wrong... I think it's at the very least... Yes, it's important to at the very least consider the new guidelines, I think is what the Supreme Court said. Robbery can be committed by three different ways. The first, you need to be committing a theft, and one of three other actions. The first action is an assault. In Iowa, an assault could be committed in various different ways, including an offensive or insulting touch. In State v. Spears, 312 NW 2nd 79, Mr. Spears reached into the pocket of a bartender and stole the bartender's wallet, and the Iowa Supreme Court determined that that was an offensive touching, and as a result, was a robbery. Well, under Johnson, we know that the amount of force required to be a crime of and under those circumstances, certainly reaching into the apron of a bartender's apron is not capable of causing physical pain or injury. Another way to... action that somebody could do under robbery is to threaten another with or purposely put another in fear of immediate serious injury. Now, first blush, that sounds bad, obviously, but in the Iowa Supreme Court and State v. Heard determined that when Mr. Heard put a paper bag on his head and socks on his hands, and the Iowa Supreme Court determined that that was enough because the clerk could have feared contact which would have been doesn't meet the standard by Johnson, and as a result, that one wouldn't be enough force to qualify as a violent felon or crime of violence either. The third action that somebody could do is to threaten somebody with a forcible felony. Iowa Code 70211 lists all the forcible felonies in Iowa, and one of those forcible felonies is arson, and obviously arson doesn't involve the use, threatened use, or attempted use of physical violence against another, and so these three actions would not be enough to qualify as crime of violence. So if somebody's convicted of Iowa robbery, uh, you could not be qualified as a crime of violence. Uh, Your Honor, as I only have 55 seconds left, I would yield my time to Ms. Quick. Ms. Quick, your rebuttal? I'm sorry, uh, I'm gonna hear from the government first. Good idea. Mr. Chatham. Thank you, Your Honor. I'll start, uh, where Mr. Goldensoft ended, uh, at least just briefly mentioned it. I think, uh, Judge Render, you're correct. This is a harmless hour case. The district court specifically stated, uh, could you speak up a bit or you may want to raise the mic there and get a little closer? I apologize, Your Honor. Uh, the district court specifically stated that, uh, even if, uh, the career offender range did not apply, they would have sentenced him to the exact same sentence. So this is a harmless error case. Uh, and for the reasons that are cited in our brief, uh, even if it weren't a harmless error case, the defendant was in fact a career offender because the bank robbery itself was a crime of violence. And the defendant had an armed robbery that he, uh, uh, that's not disputed was a prior. And then he also had the, an Illinois burglary and, uh, or excuse me, an Illinois robbery and the Iowa robbery that was discussed. And for the reasons stated in our brief, uh, that a career offender designation was correct in this case. Are you, are you familiar with a Supreme court case that Mr. Golden's, uh, soft cited? Uh, generally speaking, yes, Your Honor. I, I, I didn't review it in preparation for this, but I think it has any impact on our harmless error cases. I do not, Your Honor. I think, uh, the cases in this circuit are, and Davis is the case that cited in our brief that, uh, very clearly states that if the, uh, district court made it clear that it considered that even if the, uh, the, the, uh, if, if the, uh, the range was calculated incorrectly that under the 3553 a factors would have found the same sentence applies. Uh, if, uh, as, as, uh, discussed here, I don't believe the Supreme court, uh, stated that it undermined that rationale at all. Uh, it's, it's, it might be a situation where, uh, if the district court totally didn't understand or didn't know what the guideline range was or didn't make an explicit statement tied to, uh, even if that case area, if that range is wrong, then I would, uh, I would have gone, then that might be a different situation, but that's not what we have here. What we have is clearly within the bounds of the eighth circuit law, uh, that I don't think has court. Uh, now with respect to the reasonable suspicion argument, uh, I would agree with the, the questioning, uh, or the, the statements by, by the court, uh, that with respect to the reasonable suspicion, the officer here plainly had, uh, specific articulable facts that he, uh, reasonably relied on in stopping that vehicle. It was a, uh, the description was, uh, it was a Ford Taurus heading southbound on highway 94. Uh, and, uh, and I believe the record showed that they actually stopped the vehicle about 5.8 miles away from the bank. And at about eight, seven to eight minutes after the bank robbery happened, that's exactly as long as it would take there. So the vehicle was bearing in the correct direction. It was, it met the exact, uh, description provided by the individuals on the phone, uh, and it was in exactly the right location. So those are specific articulable facts that the deputy was very reasonable in relying and stopping that vehicle. The witness identify whether the driver would be a male or female? Uh, I don't believe so, your honor. I believe the, the description, the initial description was two individuals, one of whom was an African American. Uh, and then I think that's but it was two individuals that they described running from it. I believe gray hoodies, uh, they said that they were wearing. Were there any other distinguishing features of the vehicle other than color and make a model? There was, uh, that was the initial tip. There was an initial, uh, or there was some supplemental information because the, the, the witnesses in this case, they weren't at the bank, they were nearby. They happened to see these individuals would run out and, and, uh, and then, uh, or they, they happened to see this, this gray Ford Taurus run or drive off. So they'd seen both, but they hadn't seen sort of what had happened. Uh, first of all, in response to an argument that counsel made, that actually is a, is a, an important fact here that it was suspicious enough that random passersby found that to be a suspicious act, that they followed them. They followed that vehicle, uh, and, uh, and, and continued on with it and provided that information to the bank and law enforcement and attempt to, because they believed that there was something going on here and it turned out that they were correct. Um, so, uh, the additional information that was provided though, included the, uh, license plate or a partial license plate number. Uh, it turns out they got it incorrect. And I believe the deputy, uh, testified at the, at the hearing that he didn't remember what they said that the license plate was, uh, law enforcement generally did have that information. And you can hear it over the, uh, uh, over the radio on the video that, uh, that the license plate, I believe it's, uh, they was the first, it turned out that the license plate of this vehicle was DXY. And so even though deputy Ewer did not specifically recall what the dispatch had said the, uh, license plate was, the dispatcher knew that and presumably the other, uh, officers who heard and responded also knew that. So that was an additional factor that I think law enforcement generally, and I think we do look at the collective knowledge of law enforcement in this situation, uh, because it was a, uh, a robbery. Uh, the, the information that was gathered was imprecise, but it was precise enough for the officers to target this vehicle, take a look at it and start to finish. We're talking about a three and a half minute stop. Uh, that's very brief. And I think that's important in this case, uh, moving to the, uh, the extension of the scope of the, of the, uh, stop. This is a three and a brief, uh, discussion with the, uh, with the driver, the deputy sort of decides, well, I'm going to let it go. He gets asked to, uh, well, ask her a little bit more, get a little bit more information. Uh, he gets a little bit more information. Other deputies arrived at the scene. He's, uh, thinks, well, maybe we should let it go again. And the driver have left. What's that? That the driver have left after the officer says, well, okay, thank you. I don't believe so. I, I, actually at one point she started to drive away. So yes, but then he flagged it down and she stopped again. He, he, there's no audio from his mic, so we don't know exactly what he said, but she was, she was detained in the sense that this was an investigation. Was it one stop or two? Is it, it could be either, uh, your Honor. I'm not sure that the distinction. What's the new justification for the second stop? It would be the same justification, your Honor. And reasonable suspicion did not dissipate. And we would disagree with that characterization. The same reasonable suspicion for stopping at the first time. Uh, it's not determined simply by deputy yours, uh, uh, his at the scene understanding he had imperfect information. Uh, he didn't even remember actually that, uh, or that the license plate had come out collectively law enforcement, the other deputies who were responding, the dispatch, they all had the information that justified a much longer stop than just the mere seconds that the first stop was. Uh, it, it, it turned out that deputy yours initial instinct was incorrect about the car, but that did not mean that reasonable suspicion, suspicion did not still exist for this vehicle or that that, uh, investigation couldn't continue into, uh, the remaining parts of the vehicle where another occupant could be hiding. Uh, and so whether there were one stop or two stops, we still have the situation where this enforcement was able to, uh, under the fourth amendment, reasonably take a reasonable amount of time to dispel the suspicion that the vehicle itself was involved in that was, or was not involved in that, uh, crime that they were investigating. And here, three and a half minutes just does not exceed that scope. It's, it's, uh, uh, it, I, frankly, when you look at what the law enforcement did here, they were diligently working to try to find the bank where he thought, well, maybe this isn't the, maybe this isn't the car. We got to let this one go and find the real one. Uh, so he was not attempting to delay this traffic stop, make it take longer, go on some generalized fishing expedition. All of the officers there were diligently attempting to find, uh, to figure out whether this was the vehicle they wanted to find the correct vehicle. And then they wanted to investigate that thoroughly. Uh, and that's in the trunk. Uh, that's not an unreasonable, uh, uh, uh, time, amount of time for a bank robbery investigation for a, uh, the vehicle that, uh, was as precisely described as this one was. And, uh, I will, uh, mention here, uh, counsel talked about, uh, Ms. Quist talked about the, uh, the game of telephone and the tip to law enforcement. Uh, we've mentioned in our brief, this is, uh, this was actually a, a quite good tip, uh, when, in the grand scheme of things. And I think it's very similar, uh, to the tip that, uh, came up in the Roberts case that cited in our brief. Uh, the tip was, uh, specific. And actually in this case, we had an individual who provided their name and phone number to law enforcement. Uh, and there's no apparent motive to fabricate or anything like that on the, on the part of the individual who called in. This is just a, uh, citizen from the community who saw this, uh, event happened and was attempting to provide relevant information to the police. Uh, the at that point to start cross-examining the, uh, the individual through the phone or through the, the dispatch, uh, they had a limited amount of information and we're talking about a bank robbery. Uh, it's a very serious crime. And so they took three and a half minutes to, uh, to do this and all of everything beyond that was, uh, was reasonable at that point, uh, based on the information that they had. Uh, I will also, uh, like to touch on the, uh, uh, the search of the specifically found as far as the consent, the district court found that there was a question to, uh, Ms. Peel and, uh, that, uh, that specifically she had, uh, voluntarily consented to opening the trunk. And so there's the standing issue or the reasonable expectation of privacy issue that we've raised, uh, in our brief and that the district court found that, uh, the two individuals had no, uh, in the trunk had no reasonable expectation of privacy in that trunk. And we think that, uh, uh, that finding is good. It's solid. It's, it's, uh, well within the bounds of, uh, this court's case law as far as what, uh, uh, when an individual has a so-called standing to raise a fourth amendment challenge. But even if they did have standing, uh, Ms. Peel consented, the deputy said, uh, would you pop the trunk or could you pop the trunk? I believe is what the, uh, the district court ultimately found. And she did. So she wasn't threatened. It was all within the context of a three and a half minute stop. Uh, and, uh, it was a request she complied and, uh, the individuals were found. So, uh, we believe that that threat or that, uh, that consent, excuse me, was, was voluntary, uh, as found by the district court. There are no other questions, uh, from the panel. I will rely on the government's brief. All right. Thank you. Thank you, Mr. Chatham. Now, Ms. Quick. I want to start off by pushing back on the idea that the facts were precise that were provided in this tip. There was information about a car, the make and model of a car, but there were not precise facts to support that that car was involved in criminal activity. And that's, that's really what this case hinges on. What all we have here is the informant, at least that the witness thought that car was involved in the, in the robbery. Isn't that what was communicated to the officer? That was the witness had a hunch that that car was involved in the robbery and that's insufficient to rise to the level of reasonable suspicion. Word hunch. Yes. No, he did not. That's my characterization of what he, why do you characterize it as a hunch? Because all this informant saw was two men fleeing the scene of the bank, fleeing a bank. They weren't for certain at that time that a robbery had occurred, but they believe that it had and called the bank to confirm that and then go around the block and then they just see a car and they think maybe this car is involved. There's nothing. The it's just a hunch. It's an idea of this car is here in the area. We think this means something, but looking at this circuits case law, no case has gone this far to find something like that to be reasonable suspicion. Like I stated, the tipsters usually see criminal activity itself. The car is fleeing. The closest case I think would be the Danielson case where that in that case, the tipster saw the two cars near the scene of the robbery and there was suspicious activity and that they did a U-turn. People are getting out of one car and getting into another car and then a car is abandoned. That's much different than we have here and just that this gray Ford Taurus happened to be in the area. That's not enough to provide reasonable suspicion. And also the timing of the stop in our position is irrelevant. The fact that it was a short investigation because of Rodriguez. And the idea is reasonable suspicion no longer exists. So we don't have this de minimis. Well, we can still, it's just one more question. It's just, and of course our position is that it was not a question, but it's just one more step to see if there's someone in the trunk, but that's irrelevant because they no longer have. Of course, our position is that they didn't in the first place, but as the stop went on, they did not have reasonable suspicion to continue to go on this fishing expedition and detain and question Ms. Pipp. If there are no further questions for the reasons stated today and in our brief, we would ask that this court reverse the district court's denial of the motion to suppress. Thank you, Ms. Quigg.